**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 2:19-cr-8-NR |
| v. | ) | |
| | ) | |
| ROSS LANDFRIED and DAVID | ) | |
| CURRAN, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION ON PRESENTENCE INVESTIGATION REPORT OBJECTIONS**

On June 14, 2022, the jury entered a guilty verdict against Defendants Ross Landfried and David Curran. Defendants are now awaiting sentencing. The probation office filed presentence investigation reports for each Defendant. Pending before the Court are Defendants' various objections to those reports. While each Defendant raises specific objections that are unique to his own report, they both object to the drug quantities attributed to them.

After careful consideration, the Court sustains in part and overrules in part Defendants' objections, for the reasons explained below.

**DISCUSSION & ANALYSIS**

**I.      Ross Landfried.**

Mr. Landfried raises six separate objections to his PSR. He objects to: (i) the application of a two-point enhancement for possessing a dangerous weapon under U.S.S.G. § 2D1.1(b)(1); (ii) the application of a two-point enhancement for using violence, making a credible threat of violence, or directing the use of violence under U.S.S.G. § 2D1.1(b)(2); (iii) the application of a four-level enhancement for his role in the conspiracy as an organizer or leader; (iv) the drug quantity attributed to him; (v) the calculation of his criminal history score; and (vi) the forfeiture amount. After reviewing the record in detail, the Court overrules these objections.

**A.** **The Court overrules Mr. Landfried's objection to the application of the dangerous-weapon enhancement.**

Under U.S.S.G. § 2D1.1(b)(1), a defendant's Guidelines offense level should be increased by two levels "[i]f a dangerous weapon (including a firearm) was possessed." For this enhancement to apply, the government must "show only that the defendant possessed a dangerous weapon, and it can do so by establishing that a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant." *United States v. Napolitan*, 762 F.3d 297, 309 (3d Cir. 2014) (cleaned up). A defendant can "possess" a weapon if he personally possessed it or if a co-conspirator's possession of a weapon was reasonably foreseeable to the defendant. *United States v. Foy*, 641 F.3d 455, 470 (10th Cir. 2011). "Once the government makes out a prima facie showing that the defendant drug-dealer possessed a weapon, the burden of production shifts to the defendant to demonstrate that the connection between the weapon and the drug offense was 'clearly improbable.'" *Napolitan*, 762 F.3d at 309 (citation omitted).

Humberto Herrera testified that, when he was incarcerated with Mr. Landfried, Mr. Landfried and two accomplices threatened him with knives unless Mr. Herrera "boofed" K2-saturated paper for Mr. Landfried (*i.e.*, hid the K2 paper by placing it in the fingers of rubber gloves and then inserting the fingers of the glove into his rectum). ECF 3575, Testimony of H. Herrera, 186:13-187:14. The reason Mr. Landfried made this threat was that Mr. Humberto owed him a $250 debt. *Id.* If credible, this testimony by itself is sufficient to support the application of the dangerous-weapon enhancement.

Mr. Landfried argues that the Court shouldn't believe this testimony, however, because Mr. Herrera is "not a credible and reliable source of information." ECF 3833, p. 3. According to Mr. Landfried, Mr. Herrera was "consistently inconsistent" and shouldn't be trusted considering his "criminal history." *Id.* Given the detail of Mr.

Herrera's testimony and its embarrassing nature, the Court's determination of Mr. Herrera's credibility as a witness at trial, and the other corroborating evidence offered by the government, Mr. Landfried's attempts to impeach Mr. Herrera are not convincing.

Mr. Herrera painted a vivid picture of the confrontation. And that story was personally embarrassing for Mr. Herrera. It is not an easy thing to admit to a room full of strangers that you "stored" drugs for someone by inserting them into a sensitive area of your body. But beyond that, Mr. Herrera's story was corroborated by additional information.

First, as reflected in his BOP misconduct reports, Mr. Landfried had previously possessed shanks and assaulted fellow inmates. ECF 3829, pp. 44-46. Based on this, it is plausible to conclude that he might use an improvised knife to assault Mr. Herrera. Second, Mr. Herrera testified that he intentionally got caught possessing alcohol so that he would be placed in restricted housing, away from Mr. Landfried and his threats. ECF 3575, Testimony of H. Herrera, 191:4-20. This part of the story is corroborated by Mr. Herrera's disciplinary record, which shows that he was placed in the restricted unit for an alcohol violation. ECF 3834, pp. 14-15. Third, Mr. Herrera's TruView Report confirms that Mr. Landfried appeared to be using Mr. Herrera's inmate phone account as part of his drug-trafficking activities. Sentencing Hearing Ex. 1. Fourth, more generally, the Court evaluated Mr. Herrera' a testimony at trial and found him to be credible based on its first-hand observations of his testimony and demeanor. *United States v. Leekins*, 493 F.3d 143, 150 (3d Cir. 2007) ("We give great deference to a presiding judge's credibility determinations in sentencing proceedings because she is able to directly observe a testifying witness's tone and demeanor.").

Mr. Landfried's attempt to impeach this part of Mr. Herrera's testimony boils down to pointing out that Mr. Herrera gave one conflicting account about the identity

of one of the other inmates who was acting as Mr. Landfried's accomplice during his confrontation of Mr. Herrera. ECF 3833, pp. 9-10. In one interview he said it was someone known as "Pollo," but later corrected that information to say it was another inmate known as "Casper." *Id.* This simple case of mistaken identification is not enough to undermine the credibility of Mr. Herrera's entire testimony, however. Sometimes witnesses make innocent mistakes, and the Court concludes that this was one such mistake. Indeed, Mr. Herrera appeared to correct this one at his first opportunity when going over his original account with the investigating agents. ECF 3834, p. 16.

For these reasons, the Court finds Mr. Herrera's testimony about the confrontation credible. Considering this testimony, a two-level enhancement under U.S.S.G. § 2D1.1(b)(1) is appropriate, and the Court overrules Mr. Landfried's objection.

**B.    The Court overrules Mr. Landfried's objection to the application of the use-of-violence enhancement.**

Mr. Herrera's testimony also supports the application of the two-level enhancement under U.S.S.G. § 2D1.1(b)(2) for using violence, making a credible threat of violence, or directing the use of violence. Mr. Herrera certainly found Mr. Landfried's threats credible; otherwise he would not have "boofed" drugs for Mr. Landfried. So, on that basis alone, the Court overrules Mr. Landfried's objection. But that's not the only reason this enhancement applies. The Court also finds that Mr. Landfried "used violence" when he assaulted a fellow prisoner because of a dispute over some missing drugs.

Kenneth Lawson, who was incarcerated with Mr. Landfried, testified about this prison assault at trial. ECF 3576, Testimony of K. Lawson, 41:10-42:21. Mr. Lawson stated that Mr. Landfried and Sterling Marshall, a co-Defendant in this case, "jumped on this boy and whooped him." *Id.* at 41:10-16. Mr. Lawson identified the

victim as "Keogh," but his actual name is Julian Colon. *Id.* at 41:17-19; Evidentiary Hearing, Ex. E. Mr. Lawson testified that Mr. Landfried attacked Mr. Colon because some K2 went missing, and Mr. Colon accused Mr. Landfried of taking the K2. ECF 3576, Testimony of K. Lawson, 41:23-42:21. This testimony tracked testimony that Mr. Lawson provided to the grand jury. *See* Evidentiary Hearing Ex. L, pp. 18-21. It also tracked notes from the investigating agent's interview of Mr. Lawson at USP-Lee in early November 2018. Evidentiary Hearing, Ex. M, p. 6.

Mr. Landfried does not dispute that he and Mr. Marshall fought with Mr. Colon. ECF 3833, pp. 11-12. That much is confirmed by the BOP incident report. Evidentiary Hearing Ex. E. He instead argues that "there is not sufficient reliable evidence to connect the fight to a dispute related to K2." ECF 3833, p. 11. That's because when all three participants gave statements about the incidents, none of them admitted that it was about missing K2. *Id.* at 12. They claimed it was about keeping order in their prison clique. *Id.* Mr. Landfried also claims that Mr. Lawson's version of events is based on "assumption, speculation, or possibly rumor." *Id.* The Court isn't convinced by Mr. Landfried's arguments for at least three reasons.

First, it isn't surprising that the participants in the incident would be reluctant to admit that the fight was over contraband. The desire to avoid further misconduct charges and punishment was more than enough motivation to keep such information under wraps.

Second, the explanation for the incident that they did provide (*i.e.*, Mr. Colon was causing "trouble" for the prison clique) fits Mr. Lawson's testimony that Mr. Colon was accusing Mr. Landfried and others of stealing his drugs. Falsely accusing someone of theft would certainly cause trouble in any social group.

Third, Mr. Lawson's testimony wasn't based on "assumption" or "speculation"—it was based on firsthand knowledge. Mr. Lawson testified that he knew the incident was about missing K2 because he "lived right there beside them"

and "[y]ou know what goes on when you live in there[.]"  ECF 3576, Testimony of K. Lawson, 42:3-21.

The Court finds that Mr. Lawson's proximity to Mr. Landfried's and Mr. Colon's cell where the incident took place gives his testimony sufficient indicia of reliability.  And after observing Mr. Lawson's tone and demeanor on the witness stand, the Court finds his testimony to be credible.  *Leekins*, 493 F.3d at 150.  As a result, this attack on Mr. Colon is a separate, alternative basis for applying the two-level enhancement under U.S.S.G. § 2D1.1(b)(2), and so Mr. Landfried's objection is overruled for this reason as well.

### C.    The Court overrules Mr. Landfried's objection to the application of a four-level enhancement based on his role as an organizer or leader.

Next, Mr. Landfried objects to the application of a four-level enhancement under U.S.S.G § 3B1.1(a) for being "an organizer or leader" of the criminal conspiracy.

"The Guidelines instruct that a defendant's offense level should be increased by four levels if the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  *United States v. Rodriguez*, 40 F.4th 117, 121 (3d Cir. 2022) (cleaned up).  The defendant "need not have directed the activities of five or more persons; rather, five persons must have been involved in the conspiracy."  *United States v. Landfried*, No. 19-8, 2022 WL 3370041, at *5 (W.D. Pa. Aug. 16, 2022) (Ranjan, J.) (cleaned up).

"[M]ultiple persons may qualify as organizers or leaders of extensive criminal activity, and a criminal defendant could be an organizer, a leader, or both."  *United States v. Adair*, 38 F.4th 341, 352 (3d Cir. 2022).  "[L]abels, such as 'kingpin' or 'boss,' [do not] provide deep insight into the applicability of the organizer-leader enhancement."  *Id.* at 354 (citation omitted).    "[A]n 'organizer' is a person who generates a coherent functional structure for coordinated criminal activity.

Similarly, … a 'leader' is a person with high-level directive power or influence over criminal activity." *Id.*  In the context of a drug-trafficking conspiracy, "setting up a network to obtain and distribute drugs, deciding when and where sales would occur, coordinating drug sales with subordinates, and deciding when and whether to extend credit indicate a leadership and organizational role." *Rodriguez*, 40 F.4th at 121 (cleaned up).  That description matches what Mr. Landfried did in this case to a T.

As the credible trial testimony established, Noah Landfried used his brother, Ross Landfried, "to make the connections, to find the people in the jail that have the money to buy the stuff."  ECF 3577, Testimony of J. Evans, 29:15-30:5.  Noah Landfried needed his brother "to find those people" because Noah Landfried could not "just send it to strangers and expect them to pay[.]"  *Id.* at 29:25-30:5.  So Ross Landfried directed other inmates, like Sterling Marshall, to be the addressees for the envelopes of K2 paper that Noah Landfried and his confederates mailed to USP-Lee.  ECF 3576, Testimony of K. Lawson, 40:5-41:7; Trial Ex. 10.2.  And he directed others, like Mr. Herrera and Mr. Lawson, to store and deliver K2 paper to his customers.  ECF 3575, Testimony of H. Herrera, 190:14-18; ECF 3576, Testimony of K. Lawson, 36:2-16 ("Q. Did you ever carry any K2 paper and give it to somebody else on behalf of Ross? A. Yes, sir, I did. Q. Why were you able to do that? A. Because I had a job.  I was an orderly on the compound.  Sweeping, I can walk up to the pods, you know, up to other dorms.").

At Ross Landfried's direction, Mr. Lawson facilitated Mr. Landfried's money-laundering scheme.  ECF 3576, Testimony of K. Lawson, 36:17-39:13.  Mr. Lawson did so by accepting payment in the form of stamps for the K2, converting those stamps into funds in his BOP account, and then transferring those funds to people in Western Pennsylvania, as directed by Mr. Landfried.  *Id.* ("Q. Did you help Ross Landfried with any of his profits from the K2 paper? A. Yes. Q. What were some of the things that you did to help him with his profits? A. Well, I would usually hold the stamps.

And when we— Q. Sorry.  Tell us about the stamps, what kind of currency that is in a prison. A. It's money.  It's postal stamps.  It's what you use to buy stuff with.  I would usually—he would give them to me, and I would put them up.  Then he would send people to me.  I would give them the stamps, and they would send money to my books.  Then I would send it to whoever he wanted me to send it to.").

Additionally, Ross Landfried directed Noah Landfried to send him books with pages saturated in K2.  Trial Ex. 14.4 (in a letter, telling Noah Landfried to "order the books" (emphasis in original)).  And Noah Landfried did as he was told—even travelling from the Pittsburgh area to Philadelphia to follow through on this plan.  Ross Landfried advised Noah Landfried to "stay off them jacks"—code for not getting caught discussing any drug-trafficking plans on telephones.  *Id.*

Ross Landfried was handsomely rewarded for organizing this scheme from inside USP-Lee.  Trial Exhibit 18.2 documents some of the thousands of dollars of K2 proceeds that Mr. Lawson sent from his BOP account at Ross Landfried's orders.  Ross Landfried was doing so well trafficking drugs, in fact, that his brother, Noah, joked that Ross Landfried was "having too much fun in there" and that Ross Landfried "cares more about the money than he does about coming home[.]"  ECF 3577, Testimony of J. Evans, 30:6-12.

There were other perks to being at the top of the criminal organizational chart.  Ross Landfried could operate within different groups or "cars" of inmates and received special treatment.  ECF 3575, Testimony of H. Herrera, 205:2-11 (explaining that Ross Landfried "was the drug guy.  He was the guy that everybody wanted his stuff.  So they kissed his ass, basically.  He could to whatever he wanted.").  Other inmates "cleaned his stuff, cleaned his room" and generally just "[c]atered to him, because he was the drug kingpin."  *Id.* at 192:12-18.

Finally, while certainly not dispositive, it is relevant that others in the conspiracy considered Ross Landfried to be an organizer and leader.  They called him

"kingpin" (ECF 3575, Testimony of H. Herrera, 192:12-18), "Ross the Boss" (ECF 3576, Testimony of J. Perry, 229:8-11), and "a diamond in the rough" because of his ability to organize within the prison (ECF 3577, Testimony of J. Evans, 29:18-30:5). Perception, in this case, was reality.

In sum, the record shows overwhelmingly that Ross Landfried developed a network of drug dealers within USP-Lee, instructed his brother on the method of smuggling the drugs into the prison, provided drugs to his co-conspirators, collected money, issued other edicts, and was perceived as the "boss" of the organization. As a result, Ross Landfried was an "organizer" and "leader" of the conspiracy. *See, e.g.*, *Rodriguez*, 40 F.4th at 121 ("The District Court considered these factors when it determined that Rodriguez was the leader of the conspiracy. The record shows what the District Court found: Rodriguez set the prices, issued edicts, dictated to whom and for how much the drugs were to be sold, and provided drugs to his co-conspirators for distribution." (cleaned up)); *United States v. Hernandez*, No. 21-3383, 2023 WL 3884115, at *3 (3d Cir. June 8, 2023) ("Hernandez not only sold drugs to other dealers; he fronted drugs and required payment only after the dealers sold them. When dealers failed to pay, members of the conspiracy threatened the debtors or demanded violent favors on Hernandez's behalf to satisfy unpaid debts. We have found similar facts indicative of a leadership role under § 3B1.1(a). Further, the District Court justifiably relied on testimony describing Hernandez's continued leadership role while he was incarcerated: '[H]e runs the show, he calls the shots, period.'" (cleaned up)).

Mr. Landfried acknowledges he had an elevated role in the conspiracy; he just quibbles over the label of "leader." According to him, he was just a "manager." ECF 3833, p. 26. It's clear why he would prefer to be treated as only a manager—it would decrease his base-offense level calculation by one. But wishing something doesn't make it so, and Mr. Landfried's arguments in support miss the mark.

To support this lower classification, Mr. Landfried argues that it was his brother, Noah Landfried, and another co-Defendant, James Perry, who were the true leaders and organizers of the conspiracy. It may be true that Noah Landfried and Mr. Perry were leaders, but that doesn't mean that Ross Landfried wasn't also a leader. The facts in the record establish that Mr. Landfried checked all the necessary boxes to earn his designation. And Mr. Landfried's attempts to undermine the testimony of Mr. Herrera and Mr. Lawson are not persuasive. The Court observed their testimony and found them both to be credible.

For these reasons, the Court overrules Mr. Landfried's objection to the application of a four-level enhancement under U.S.S.G. § 3B1.1(a).

### D. The Court overrules Mr. Landfried's objection to the drug quantity attributed to him in the PSR.

In determining Mr. Landfried's base offense level for his Guidelines calculation, the probation office attributed 389 kilograms of "converted drug weight" to him.[1] That amount is significantly greater than the 100-kilogram threshold needed to support the probation office's base offense level calculation of 24 in the PSR.

The bulk of that converted drug weight consists of 320 kilograms of para-fluoroisobutyryl fentanyl, a fentanyl analogue, that was found on the paper seized from 650 Beaver Road in Ambridge, Pennsylvania in November 2017.[2] ECF 3829, p. 6. Because the weight of this analogue is independently sufficient to cross the 100-kilogram threshold, Mr. Landfried focuses his objection on this substance. ECF 3833,

---

[1] When multiple controlled substances are attributable to a defendant, like is the case with Mr. Landfried, the Guidelines direct that the applicable drug quantity is determined by converting each controlled substance into its converted drug weight quantity and then combining the converted drug weight quantities to determine a total converted drug weight quantity. U.S.S.G. § 2D1.1, Application Note 8(B).

[2] Under Application Note 8(D), one gram of a fentanyl analogue equals 10,000 grams of converted drug weight. U.S.S.G. 2D1.1, Application Note 8(D). The paper seized containing the fentanyl analogue weighed 32 grams. Multiplying 32 grams by 10,000 results in 32,000 grams, or 320 kilograms.

pp. 14-23.  According to him, the government relies on "speculative and weak evidence to connect Mr. Landfried to these pages."  *Id.* at p. 14.  He therefore argues that this "paper containing the fentanyl analogue is not part of Mr. Landfried's relevant conduct and the Court should set his base offense level at 20 for 60-80 kilograms of [converted drug weight]."  *Id.* at p. 15.  After careful consideration, the Court disagrees.

As established above, Mr. Landfried was an organizer and leader of the conspiracy.  And as such, he can be held accountable for the controlled substances distributed to or by subordinates.  *United States v. Jarmon*, 14 F.4th 268, 274 (3d Cir. 2011) ("[A]s ringleaders, [Defendants] are responsible for all the crack sold by their subordinates to further the conspiracies." (citation omitted)).  Indeed, he can even be held accountable for such quantities even if he "did not [himself] distribute or even know about" those quantities.  *Landfried*, 2022 WL 3370041, at *2 (citation omitted).  The Court must "look to the defendant's role in the conspiracy, focusing on whether the drug quantities were reasonably foreseeable given the scope of the conduct which the defendant [himself] agreed."  *Id.* (citation omitted).  The five pages of paper saturated with para-fluoroisobutyryl fentanyl that were seized from 650 Beaver Road were reasonably foreseeable to Mr. Landfried.

As this Court outlined in a prior order, Mr. Landfried, while at USP-Lee in 2017 and 2018, "admitted to a fellow inmate that he knew that some of the K2 paper he was distributing contained fentanyl."  ECF 3649, p. 4; *see also* ECF 3575, Testimony of H. Herrera, 194:1-9 ("Q. With regards to the K2 paper, did you ever discuss with Mr. Landfried what was on or in the paper? A. Yes. Q. And what did you discuss? A. Well, one day I got sick.  'Like what was on there?  What's on this paper?'  And he was like 'That's fetty.  It's fetty.'  I didn't know what it was at the time.  I kept asking him, 'What is that?'  He said, 'It's Fentanyl.  It's like opium,' something like that.").  So, by early 2018 at the latest, Mr. Landfried knew that some of the K2 paper

that was being produced and sent to him and others contained fentanyl or a fentanyl analogue.

Mr. Landfried makes a mountain out of the timeline. He disputes ever making his admission to Mr. Herrera, but even if he did, he says it was made months after the paper was seized. ECF 3833, p. 18. Thus, according to Mr. Landfried, there is no way to connect his knowledge of different paper containing a fentanyl substance to the specific paper at issue now. He also argues that there isn't any evidence to prove that this seized paper was within the scope of his "jointly undertaken criminal activity." *Id.* at 17-18. But that's not quite right.

Contemporaneous with when the K2 paper was seized at 650 Beaver Road, Mr. Landfried, and other inmates at his direction, forwarded significant amounts of K2 proceeds to Noah Landfried and his associates.

For example, Ross Landfried personally sent over $3,000 from his BOP account to Noah Landfried between October and December 2017, deceptively labeled as child support, educational material, and gifts. Trial Ex. 18.1. Ross Landfried's subordinate, Mr. Marshall, sent over $2,000 from his BOP account to one of Noah Landfried's girlfriends between September and November 2017. Trial Exhibit 18.3. And between September and December 2017, Mr. Lawson sent nearly $2,000 to co-Defendant Michel Cercone at Ross Landfried's direction. Trial Ex. 18.2; ECF 3576, Testimony of K. Lawson, 38:8-39-13.

This evidence, taken together, is enough for the Court to conclude that around the time that the paper at issue was seized: (i) Mr. Landfried knew that some K2 paper was being produced and distributed to him and potentially others that contained a fentanyl substance; and (ii) Mr. Landfried was selling that paper for significant amounts of money within USP-Lee. Whether he knew about the specific paper seized at 650 Beaver Road is irrelevant. As an organizer and leader, he knew that part of the conspiracy was to distribute K2 paper that may contain fentanyl or a

fentanyl analogue and he actively participated in that part of the conspiracy. That's far from the "generalized conclusory statements" that Mr. Landfried accuses the government of making and more than enough for the Court to conclude that the paper was reasonably foreseeable to him based on his role in the conspiracy.[3]

The Court overrules Mr. Landfried's objection to the probation office's calculation of his base offense level. The probation office's attribution of 320 kilograms of converted drug weight to Mr. Landfried for the paper seized from 650 Beaver Road is appropriate.

### E.   The Court overrules Mr. Landfried's objection to his criminal history category.

Mr. Landfried also objects to the calculation of his Guidelines criminal history category. His PSR states that his criminal history category is IV because of his seven criminal history points. Mr. Landfried challenges two points being added to his criminal history score for his 2007 DUI conviction in the Allegheny County Court of Common Pleas. He was sentenced to serve two days to six months of incarceration for that offense. Mr. Landfried argues that "[i]t is not clear from the PSR" whether this sentence "qualifies as a sentence of imprisonment" because it's possible that "an

---

[3] Mr. Landfried's reliance on the example from U.S.S.G. § 1B1.3, Application Note (4)(c)(vii) is misplaced. ECF 3833, pp. 16-17, 19-20. That example provides: "Defendant R recruits Defendant S to distribute 500 grams of cocaine. Defendant S knows that Defendant R is the prime figure in a conspiracy in importing much larger quantities of cocaine. As long as Defendant S's agreement and conduct is limited to the distribution of the 500 grams, Defendant S is accountable only for that 500 gram amount (under subsection (a)(1)(A)), rather than the much larger quantity imported by Defendant R. Defendant S is not accountable under subsection (a)(1)(B) for the other quantities imported by Defendant R because those quantities were not within the scope of his jointly undertaken criminal activity (i.e., the 500 grams)." The key distinction between this case and the Guidelines example is that in the example, one drug dealer recruits another drug dealer to distribute some quantity of drugs for him and the second drug dealer is in a subordinate role. That's not the case here. Noah Landfried and Ross Landfried were more like equals, with Ross Landfried having significant distribution responsibilities within the prison.

alternative to incarceration" was available to him.  ECF 3647, pp. 5-6 (cleaned up).
Mr. Landfried's speculation about this potential alternative is not enough to win the
day.

A sentencing court does not "need to make a further inquiry" into facts in the
PSR when the defendant fails to present "any evidence…cast[ing] doubt on the PSR's
accuracy.  *United States v. Campbell,* 295 F.3d 398, 407 (3d Cir.2002).  That's
precisely the scenario here.  Mr. Landfried presented no evidence that an alternative
to imprisonment was available to him.  ECF 3647, pp. 5-6.  Thus, his argument that
two points should not be added for his DUI conviction is "without merit."  *United
States v. Norman*, 465 F. App'x 110, 126 (3d Cir. 2012) ("Here, the PSR states that
Smith was sentenced to a term of imprisonment of not less than 48 hours nor more
than 12 months.  While Smith claims the sentence was suspended, he did not present
any evidence to substantiate this claim.  Accordingly, the District Court did not err
by relying on the information in the PSR." (cleaned up)).

While the Court overrules this objection, this ruling is without prejudice to Mr.
Landfried providing additional evidence of his state DUI sentence at the sentencing
hearing and arguing for a variance based on the circumstances of that offense.[4]

### F. The Court overrules Mr. Landfried's objection to the forfeiture amount.

The forfeiture allegations in the Superseding Indictment include "$4,416.97
seized from the NEOCC account of ROSS LANDFRIED on or about May 7, 2019."
ECF 501, p. 25.  Mr. Landfried objects to forfeiture "due to a lack of sufficient credible
evidence to satisfy the requirements for forfeiture."  ECF 3647, p. 6.  Aside from this
conclusory statement, Mr. Landfried offers no other argument for why the Court

---

[4] Mr. Landfried has many other convictions that were not added to his criminal
history score and repeated serious misconducts that he has received while
incarcerated.  *See* ECF 3829, pp. 43-46. The government is free to argue at the
sentencing hearing for an upward variance based on the fact that Mr. Landfried's
criminal history is actually understated.

should sustain his objection.  He did not make any presentation regarding forfeiture during the evidentiary hearing and this objection is absent from his post-hearing briefing.  After reviewing the trial record and the affidavit for the seizure warrant, the Court finds that there is a factual basis for the seizure and forfeiture of these funds.

A preponderance-of-evidence standard applies to the forfeiture of the account funds.  *United States v. Gardenhire*, No. 15-87, 2017 WL 6371362, at *8 (W.D. Pa. Dec. 13, 2017) (Fischer, J.).  The government may meet this standard by proving an adequate connection between the account funds and the crimes of conviction "based on evidence already in the record...and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable."  *Id.* (citations omitted).

Mr. Landfried was convicted of engaging in conspiracies to traffic drugs and launder money.  Under 18 U.S.C. § 982(a)(1), Mr. Landfried's interest in the seized funds is subject to forfeiture as property that was involved in the money laundering crime or as property that is traceable to such property.  "Property 'involved in' the offense 'includes the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the offense."  *United States v. Gordon*, 710 F.3d 1124, 1135 n.13 (10th Cir. 2013) (cleaned up).  "[P]roperty 'traceable to' means property where the acquisition is attributable to the money laundering scheme rather than from money obtained from untainted sources."  *Id.*  Property "involved in" money laundering or "traceable to" such property can be established through circumstantial evidence of a defendant's inability to acquire the property through means independent of the money-laundering crime.  *See United States v. Juluke*, 426 F.3d 323, 327 (5th Cir. 2005) (per curiam) (affirming inference of drug proceeds where "bank deposits significantly exceeded...known legitimate income").

Based on the record, the Court finds that the $4,416.97 seized from Mr. Landfried's account was property involved in or traceable to his money laundering activities. As discussed above, he obtained the account funds during the period of the crimes or within a reasonable time after such period, and he had no likely source for such property other than the crimes. In fact, the trial testimony and exhibits demonstrate that over $8,000 in drug-trafficking proceeds was deceptively sent at the direction of Ross Landfried. *See* Trial Exs. 18.1, 18.2, 18.3. Mr. Landfried's objection to the forfeiture is therefore overruled.[5]

## II.   David Curran.

Mr. Curran raises three objections to his PSR. He objects to: (i) the description of the offense conduct, specifically the characterization that he directed his mother, Judy Curran, to receive payments for drug-trafficking activity and then forward payment to his inmate account; (ii) the drug quantity attributed to him; and (iii) the calculation of his criminal history score. ECF 3832. After reviewing the record in detail, the Court sustains these objections in part and overrules them in part.

### A.   The Court sustains Mr. Curran's objection to the application of the two enhancements related to his mother's alleged involvement.

Mr. Curran objects to the application of a two-level enhancement to his offense level under U.S.S.G. § 3B1.1(c) for "managing" his mother's involvement in the criminal conspiracy. He also raises a related objection to a two-level enhancement under U.S.S.G. § 2D1.1(b)(16)(A) for using "fear, impulse, friendship, affection, or some combination thereof" to involve his mother in the conspiracy. At bottom, the basis for these objections is the same—Mr. Curran argues that his mother was simply not involved. The government argues that Mrs. Curran did participate in the

---

[5] The funds are also subject to forfeiture as a substitute asset under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853, for the reasons stated in the government's sentencing memorandum at ECF 3829.

conspiracy but concedes that she did so perhaps unknowingly.  ECF 3834, p. 25 ("Mr. Curran involved his mother in his scheme, likely without informing her of all of the details.").  The Court will sustain Mr. Curran's objections to these enhancements because the government has not presented sufficient evidence to support imposing them.

Section 3B1.1 allows for a two-level enhancement if the defendant was "an organizer, leader, manager, or supervisor in any criminal activity" with fewer than five participants.  U.S.S.G. § 3B1.1(c).  "To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants."  U.S.S.G. § 3B1.1 cmt. n.2.  Importantly, a "participant" is defined as "a person who is criminally responsible for the commission of the offense, but need not have been convicted."  U.S.S.G. § 3B1.1 cmt. n.1.  The Third Circuit has therefore explained that "[t]o be deemed a participant under the Guidelines, the individual must be criminally responsible, *i.e.*, s/he must have committed all of the elements of a statutory crime with the requisite *mens rea*."  *United States v. Tai*, 750 F.3d 309, 318 (3d Cir. 2014) (cleaned up).

The only participant that Mr. Curran allegedly managed was his mother, Mrs. Curran.  So to support imposing this enhancement, the government must show by a preponderance of the evidence that Mrs. Curran was a "participant" in the conspiracy—that is, she agreed to launder money ***with the intent*** to promote the carrying on of a specified unlawful activity.  *See* ECF 3488-1.  The government has not met its burden in proving intent.

To prove Mrs. Curran's participation in the criminal conspiracy, the government primarily relies on the testimony of two cooperating witnesses: Nicholas Green and Raymond Fields.  Mr. Green was Mr. Curran's former cellmate at FCI-McDowell in 2017 and 2018.  ECF 3575, 138:23-139:6.  According to Mr. Green, he bought K2-soaked paper from Mr. Curran.  *Id.* at 145:25-146:4.  To pay for it, he

would, allegedly, sometimes "have a relative or a friend of [his]…on the outside send a money order to a specific individual, whoever [Mr. Curran] wanted [Mr. Green] to have the money sent to." *Id.* at 152:25:153:2.  Pursuant to this plan, Mr. Green claimed that he "sent money to Judy Curran." *Id.* at 154:1.

Mrs. Curran, however, categorically denied receiving money from any inmate at FCI-McDowell.  ECF 3822, 61:9-14, 65:2-20.  And she specifically denied ever receiving money from Mr. Green:

Q:    Did you ever receive money from a Nicholas Green?

A:    No.

*Id.* at 56:16-17.  The government had an opportunity to cross-examine Mrs. Curran on her statements and confront her with contradictory documentary evidence but failed to do so.  *See id.* at 56:23-68:13.  Indeed, the government has still not come forward with any documentary evidence that would support Mr. Green's version of events.  Instead, after the evidentiary hearing regarding Mr. Curran's objections, the government submitted a series of somewhat ambiguous TruView records that are not enough to meet the government's burden on the enhancement.

One of those records appears to show money being sent to Judy Curran from "James Russell." ECF 3829, p. 30; ECF 3829-1.  There is no other record of money being sent to Judy Green by an inmate at FCI-McDowell. *Id.*  There was no testimony at trial or the evidentiary hearing about James Russell.  As a result, the Court has no way of knowing whether he participated in the use or distribution of K2-soaked paper.  It was incumbent on the government to provide context for this record; for example, it should have presented the records to Mrs. Curran and asked her to explain the transaction at issue or elicited testimony about Mr. Russell and any dealings he may have had with Mr. Curran from other witnesses.  The government didn't do that, however, and the Court cannot make inferential leaps to apply an enhancement that the government bears the burden of proving up.

The other TruView records the government provided only appear to show funds being transferred in the "wrong" direction; that is, money being transferred *from* Mrs. Curran *to* several inmates (none of whom are Nicholas Green). *See* ECF 3829, pp. 31-32. There could be myriad reasons, both legitimate and illegitimate, why Mrs. Curran would send money to inmates on behalf of her son. For example, she could be paying debts related to gambling, the *purchase* of contraband, or the purchase of jailhouse services. The key point here is that the record is underdeveloped about the nature of these transactions, which impermissibly forces the Court to speculate. In short, these additional TruView records, without the necessary context, do not undermine Mrs. Curran's credibility on the key testimony outlined above. And observing Mrs. Curran's tone and demeanor, the Court finds her denials about engaging in any financial transactions with Mr. Green credible. *Leekins*, 493 F.3d at 150.

Mr. Fields's testimony fares no better. Mr. Fields knew Mr. Curran from his few months spent at the Allegheny County Jail in 2021. ECF 3577, Testimony of R. Fields, 82:10-23. During that time, Mr. Fields testified that he spoke to Mr. Curran about how Mr. Curran sold K2 paper at ACJ. *Id.* at 85:7-87:22. Mr. Curran told Mr. Fields that the paper Mr. Curran sold was being smuggled into the jail by a corrections officer. *Id.* at 86:24-87:14. That corrections officer had allegedly obtained the K2 paper from Mrs. Curran. *Id.* at 87:15-22. The Court finds that Mr. Fields's testimony does not support the government's cause for at least three reasons.

First, Mr. Fields's testimony was inconsistent. He claimed he'd never received money for participating in any drug-trafficking activity at ACJ, but that testimony contradicted his original statement to Special Agent Harpster. *Id.* at 95:18-96:18.

Second, the entire basis for Mr. Fields's testimony was hearsay statements made by Mr. Curran, but it's not clear that Mr. Fields even believed what he was allegedly being told. That's because according to Mr. Fields, Mr. Curran "is a liar.

He brags too much. Runs his mouth." *Id.* at 100:7-8. As a result, Mr. Curran "said a lot of things [Mr. Fields] didn't believe." *Id.* at 100:10-11. As for the claim that Mrs. Curran was helping Mr. Curran smuggle K2 paper into ACJ, Mr. Fields said, "it didn't mean nothing to [Mr. Fields]." *Id.* at 102:19. Based on Mr. Fields's own admissions that these statements, if made at all, weren't to be trusted, the Court will not give them credence.

Third, Mr. Fields's testimony describes conduct that post-dates the conduct for which Mr. Curran was convicted. That conduct occurred between 2017 and 2018. Mr. Fields only interacted with Mr. Curran several years later in 2021. Even if the Court fully credited Mr. Fields's testimony, which it does not, the Court would have to assume that Mr. Curran operated in the same way several years earlier. There's not a sufficient evidentiary basis to do so.

All that's left of the government's evidence, then, are transcripts from a few phone calls between Mr. Curran and Mrs. Curran. The government contends that these "coded" conversations likely mean that Mrs. Curran was funneling money into the prison in support of Mr. Curran's drug-trafficking activities. ECF 3829, pp. 32-34. After reviewing the calls in their entirety, the Court is not convinced.

Mrs. Curran testified that she couldn't make heads or tails of these calls now, and didn't understand what Mr. Curran was saying at the time. ECF 3822, Testimony of J. Curran, 59:24-60:8, 62:20-64:8. It wasn't uncommon for Mrs. Curran to be confused by her son's conversations. *Id.* at 60:15-18 ("I think sometimes he gets so excited and he gets so hyper that you just say okay, okay."). And having listened to the entirety of the calls, the Court understands why. The conversations seem to be occurring in shorthand. The government asks the Court to infer a nefarious purpose from this fact. ECF 3829, pp. 31-34. But the full context of the calls suggests that Mr. Curran could be discussing other personal, family, or legal matters with his mother. *See* ECF 3822, Testimony of J. Curran, 60:1-2 ("I don't know if he was talking

about dealing with my sister or I don't know."); 63:24-64:3 ("I don't even remember this, but—I don't know. When he goes into the hole you don't put money on right away for his account.  You put it on at the end so when he gets out.  Then he can go to the commissary, because they take his stuff when he goes to the hole and he has to re-buy it.").

After considering Mrs. Curran's testimony at the hearing, the Court concludes that she was credible, particularly when she testified that her son would simply run his mouth, and she would have no idea what he meant, but would simply say, "okay." Mr. Curran may have had his mother participate in the money-laundering scheme, but the Court finds that Mrs. Curran lacked the *mens rea* and was, at most, only an unwitting participant.  That is not enough to trigger the enhancement.  *Tai*, 750 F.3d at 319.[6]

In sum, the government has not met its burden of proving that Mrs. Curran was a "participant" in the conspiracy who had sufficient criminal intent, which is necessary for the imposition of the two-level enhancement under U.S.S.G. § 3B1.1(c). Since Mrs. Curran was not a participant, Mr. Curran could have not used "fear, impulse, friendship, affection, or some combination thereof" to induce her participation.  Therefore, the tagalong two-level enhancement under U.S.S.G. § 2D1.1(b)(16)(A) also does not apply.  *See United States v. Sampel*, 860 F. App'x 789, 792 (2d Cir. 2021) ("[Defendant] maintains on appeal that neither the evidence cited by the district court, nor any other record evidence, establishes that he directed his wife's participation in the criminal activity or that he used affection to involve her in his crimes.  We agree.").

---

[6] The government argues that Mrs. Curran wasn't credible when she testified about sending money to other prisoners.  ECF 3829, pp. 29-42.  The Court doesn't draw that same inference.  Mrs. Curran, as an unwitting conduit, very likely could have had little recollection of activities that she believed to be innocuous.

The Court sustains Mr. Curran's objection to the application of these two enhancements, which improperly increased his base offense level by four levels.

**B.    The Court overrules Mr. Curran's objection to the drug-quantity calculation in his PSR.**

The PSR attributes 36.07 kilograms of total converted drug weight to Mr. Curran.  According to the government, this amount is based on combining "(1) the envelope addressed to Mr. Curran and interdicted at FCI-McDowell in August 2017 that contained 15 pages[;] (2) the 10 sheets of K2 paper (at least), plus K2 greeting cards, that Nicholas Green witnessed Mr. Curran in possession of[;] (3) the additional K2 paper/greeting cards that Mr. Curran possessed that were not witnessed by Nicholas Green; and (4) the quantity of K2 paper distributed by Noah Landfried to others that was reasonably foreseeable to Mr. Curran."  ECF 3829, p. 14.  A total converted drug weight of 36.07 kilograms is over the 20-kilogram threshold to establish a base offense level of 16 for Mr. Curran.

Mr. Curran raises four specific objections to this total.  First, he "objects to the sampling procedure used to determine the weight for the August 2017 mailing[.]"  ECF 3832, p. 6.  Second, he "objects to the attributable amount of pages and cards arrived at through Nicholas Green's testimony."  *Id.*  Third, "[h]e objects to additional pages and cards which Nicholas Green did not observe, and for which no support can be found."  *Id.*  And fourth, he "objects to pages and cards which were distributed by Noah Landfried and, the government argues, would have been reasonably foreseeable to [him]."  *Id.*

After careful consideration, the Court will overrule Mr. Curran's first two objections, but limit the number of greeting cards that can be attributed to him.  That is, the Court finds that there is sufficient support to attribute 25 pages of K2-saturated paper and two K2-saturated greeting cards.  Because the weight of this material alone is enough to clear the 20-kilogram threshold for his base offense level,

the Court considers no other materials that the government attempts to attribute to Mr. Curran and overrules Mr. Curran's objections to these other amounts as moot.[7]

### 1.   The Court overrules Mr. Curran's objection to the sampling procedure used to test the seized mailing.

In August 2017, a mailing addressed to Mr. Curran was seized at FCI-McDowell.  The DEA lab sample tested that seized mailing as a group—meaning that a piece of each page from the mailing was collected and tested together—and found that the mailing contained synthetic cannabinoid controlled substances.  Trial Exs. 29.1, 29.2, and 19.3.

Mr. Curran does not object that this mailing is attributed to him, the number of pages that it contained, or the total weight of that mailing.  ECF 3832, p. 6.  His objection is only that the sampling method the DEA lab used to test the mailing does not allow the Court to reasonably conclude that all 15 pages of the mailing contained controlled substances.  Rather, "the testing showed that there was at least one page that contained controlled substances."  *Id.* at p. 11.  Thus, Mr. Curran argues "[t]here is an evidentiary basis for only one page, which would result in 7.2 grams of synthetic cannabinoids for this portion of the relevant conduct calculation for Mr. Curran."  ECF 3832, p. 17.  The Court disagrees.

"The government bears the burden of proving the weight of the drugs involved in an offense by a preponderance of the evidence."  *United States v. Self*, 681 F.3d 190, 201 (3d Cir. 2012) (citation omitted).  "When a defendant challenges a drug quantity estimate based on an extrapolation from a test sample, the government must show, and the court must find, that there is an adequate basis in fact for the

---

[7] Mr. Curran concedes that "[f]or the drugs in these cases, the synthetic cannabinoids could not be removed from the paper on which they were sprayed, and therefore the weight of the paper must be included."  ECF 3832, p. 4.  This concession is consistent with the Court's prior opinion on objections raised by one of Mr. Curran's co-defendants.  *United States v. Landfried*, No. 19-cr-8, 2022 WL 3370041, at *10-11 (W.D. Pa. Aug. 16, 2022) (Ranjan, J.).

extrapolation and that the quantity was determined in a manner consistent with accepted standards of reliability." *Id.* at 202 (cleaned up). But this standard "does not, however, require the government to adduce any sort of statistical evidence; rather, reasonable reliability is the touchstone of the determination." *Id.* (cleaned up). The weight calculation here was reasonably reliable.

Mr. Curran first complains that "[t]he sampling procedure used was provided by [Special Agent] Harpster, and creates serious concerns about the weights at issue[.]" ECF 3832, p. 6. In support, Mr. Curran points to a lab report for a different piece of evidence with a notation that states: "As per phone conversation with SA. Eric J. Harpster, a representative piece of each of the 20 papers was sampled, all pieces were collected together and immersed in methanol." *Id.* p. 10 (citing Curran Appx. C).

Special Agent Harpster, however, flatly denied that he suggested any testing procedure to the DEA lab. ECF 3822, Testimony of E. Harpster, 28:15-29:3 ("I wouldn't direct them to do their job in any way. I don't have anything to do with their job. I would simply talk to them about having the paper tested, and if they had the capabilities to test it, to find out if we could take it there. I would not direct them in any manner."), 42:6-19 ("I wasn't directing the lab. I'm sure that they asked me how I wanted it done, and I would have just told them, you know, you are the lab. Do it the way that you test—you would normally do it."). The Court finds his denials credible.[8]

---

[8] Moreover, it doesn't make sense that the trained and experienced professionals at the DEA lab would simply defer to the investigating agent on the proper method for testing a sample. Indeed, Special Agent Harpster expressed believable self-awareness regarding his lack of expertise on best laboratory practices and procedures and stated that he would not presume to instruct the DEA lab on how to do its job. *Id.* at 43:17-19 ("[S]ince I'm not a chemist or analyst, I would have deferred to them how they do it."). The Court finds that Special Agent Harpster did not "direct" the DEA lab to use the sampling method at issue.

As for that sampling method, the root of Mr. Curran's substantive complaint is that every individual page should have been tested. Special Agent Harpster testified that the DEA lab would not have done that in this case, though, even if he directly asked. *Id.* at 48:19-23. And despite Mr. Curran's suggestion to the contrary, there doesn't appear to be anything unusual about the sampling method employed by the DEA lab—both the Allegheny County Lab and the Pennsylvania State Police Lab employed substantially similar sampling methods. *See* ECF 3834, pp. 21-23.

The use of this method is also appropriate considering the facts of the case. As this Court previously ruled, the trial evidence linked the seized mailing to Noah Landfried. ECF 3659, pp. 4-6. As part of his scheme, Noah Landfried saturated with K2 all the pages of the bogus legal mail he had sent into prisons to make them all look the same and avoid detection. ECF 3822, Testimony of E. Harpster, 16:22-18:21.

While it is true that someone could alternate pages, rather than saturate every page, as Special Agent Harpster conceded during his testimony (*id.* at 37:16-25), there is no evidence that is what Noah Landfried and his co-Defendants did in this case related to these bogus legal mailings. In fact, James Perry and Larry Benavides, two co-Defendants involved in the production of Noah Landfried's K2-saturated paper, claimed that it was their practice to saturate every page. ECF 3186, Testimony of J. Perry, 75:1-21 ("Q. Would he like skip pages of the legal documents, or would he— A. No. It would be like case law, the United States versus So-and-so. It would just be bogus just so it could pass through when it gets to the prison. Q. If it was like a 15-page legal opinion, would all 15 pages be K2 paper? A. Yes."); ECF 3822, Testimony of E. Harpster, 16:22-18:21 ("Q. Did Mr. Benavides have any knowledge of whether they would produce only—saturate only certain pages that were sent off or all the

pages? A. Yes, he did. That they were all saturated and to include even the envelope on occasions.").[9]

Considering the above evidence, the sampling method used by the DEA lab to test the seized mailing was reasonably reliable, and the Court will attribute the weight of the entire mailing to Mr. Curran—108 grams.

### 2. The Court overrules Mr. Curran's objection to the drug quantity established through Mr. Green's testimony.

Mr. Curran next objects to additional pages of K2-saturated paper and greeting cards linked to him through Mr. Green's testimony. ECF 3832, pp. 18-23. According to Mr. Curran, the government cannot connect this added material to the Noah Landfried conspiracy. *Id.* at pp. 17-19. The Court overrules Mr. Curran's objection.

"At sentencing, the government bears the burden of proving drug quantity by a preponderance of the evidence." *United States v. Douglas*, 885 F.3d 145, 150 (3d Cir. 2018) (cleaned up). "When sentencing a defendant for a drug-related conviction that involves some quantity of unseized drugs, a district court must approximate the quantity of the controlled substance." *United States v. Gordon*, No. 20-1596, 2021 WL 3781722, at *2 (3d Cir. Aug. 26, 2021) (cleaned up). "Altogether, the evidence need not be admissible at trial, but it must possess sufficient indicia of reliability to support its probable accuracy." *Id.* (cleaned up). That indicia of reliability may be met through "corroboration by or consistency with other evidence[.]" *United States v. Freeman*, 763 F.3d 322, 337 (3d Cir. 2014) (cleaned up).

Mr. Green testified that he witnessed Mr. Curran in possession of more pages of K2-saturated paper. Mr. Green stated that Mr. Curran was the K2 supplier for

---

[9] Mr. Curran urges the Court to disregard this testimony because both Mr. Perry and Mr. Benavides were not linked directly to the seized mailing. ECF 3832, pp. 12-16. The Court will not do so, however, because it establishes a pattern and practice for Noah Landfried's drug-trafficking operation to which Mr. Curran was linked. It is reasonable for the Court to infer that Mr. Landfried employed those same practices with respect to the seized mailing at the heart of Mr. Curran's objection.

most of the K2 users in his unit at FCI-McDowell.  ECF 3575, Testimony of N. Green, 146:11-16 ("Q.  In the time that you knew Mr. Curran, so the 2018 time frame when you guys lived on the same pod—same unit, I mean, approximately how many customers do you think Mr. Curran had?  A.  I guess it would really be the majority of the people that smoke K2 on the unit.  So quite a few.").  When asked, Mr. Green estimated that he saw Mr. Curran with "upwards of maybe ten or better" sheets of K2-saturated paper and "some greeting cards."  *Id.* at 151:1-24.  The Court finds this testimony to be credible.

Under U.S.S.G. § 1B1.3(a)(2), Mr. Curran's relevant conduct includes "all acts and omissions…that were part of the same course of conduct or common scheme or plan as the offense of conviction."  It is reasonable for the Court to conclude that the possession of this additional K2-saturated material around the same time as the seized mailing and at FCI-McDowell was part of Mr. Curran's same conduct to serve as a source of supply of K2 within the prison.  That's true whether Noah Landfried supplied him with this added material or someone else did.  It also doesn't matter if this material was only for his "personal use."  "[A] defendant convicted of conspiring to distribute drugs is not entitled to exclude a personal use amount from the total quantity of drugs involved in the conspiracy."  *United States v. Iglesias*, 535 F.3d 150, 160 (3d Cir. 2008).

That said, the Court will not extrapolate an amount of either the paper or greeting cards beyond the lowest amount to which Mr. Green testified.   For paper, that means ten pages.  For greeting cards, that means two cards.  The Court arrives at two for the number of greeting cards because Mr. Green testified that he had seen Mr. Curran with "some greeting cards."  This testimony ("some greeting cards") suggests more than one card, but the Court cannot, from this testimony, extrapolate a more precise number.

As for the weight of this unseized material, the Court relies on the government's unrebutted testimony.  For the K2-saturated paper, DEA Special Agent Keith Stamper testified that his weighing of a standard sheet of paper resulted in a weight of about four grams.  ECF 3448, Testimony of K. Stamper, 74:22-75:3.  Although this paper was unsaturated, the Court will err on the side of caution and use only this four-gram weight for the additional paper possessed by Mr. Curran.  Ten pages multiplied by four grams per page results in 40 grams.

The government offered unrebutted testimony that a standard greeting card weighs about 20 grams.  *Id.* at 74:8-21; *see also* ECF 3449, Testimony of M. Truesdell, 35:9-14, 42:10-24.  Agent Truesdell explained that a "standard card" is a "five-by-eight folded card you just open like a book.  No inserts.  No pop-ups.  No batteries.  Nothing," and the 20-gram weight does not include the envelope.  ECF 3449, Testimony of M. Truesdell, 42:10-43:1.  Multiplying 20 grams by two greeting cards results in another 40 grams.  The sum of the two amounts together is 80 grams.

### 3.   The drug weight attributable to Mr. Curran exceeds the minimum threshold to support the calculation of his base offense level in the PSR.

From the sources discussed above, Mr. Curran is responsible for at least 188 grams of synthetic cannabinoid controlled substances.  The Sentencing Guidelines state that 1 gram of a Schedule I or II synthetic cannabinoid amounts to 167 grams of converted drug weight.  So, the 188 grams translates to about 31.4 kilograms of converted drug weight, which is still greater than the 20-kilogram threshold to support a base offense level of 16.  As a result, the Court need not address Mr. Curran's objections to the other sources of drug weight the government argues are attributable to him.  The probation office appropriately determined Mr. Curran's base offense level to be 16.

**C.     The Court sustains Mr. Curran's objection to the calculation of his criminal history.**

Mr. Curran objects to the inclusion of one criminal history category point for a prior conviction in Utah for possession of marijuana and drug paraphernalia.  ECF 3832, pp. 26-27.  The government concedes that this point should not have been included.  ECF 3829, p. 46.  The Court agrees. When this conviction is not counted, Mr. Curran's criminal history category is reduced from IV to III.[10]

## CONCLUSION

For these reasons, the Court overrules all of Mr. Landfried's objections to his PSR, and sustains in part and overrules in part Mr. Curran's objections to his PSR. An order consistent with this opinion follows.


Dated: August 8, 2023                          BY THE COURT:


                                               /s/ *J. Nicholas Ranjan*
                                               United States District Judge

---

[10] The Court will take the government's argument that "Mr. Curran's criminal history category does not account for significant parts of his actual criminal history above and beyond the 2010 Utah sentence" under advisement and address it at the time of sentencing in the context of determining whether a variance is appropriate.  ECF 3829, p. 47.